[Crim. No. 2621.   First Dist., Div. One.   Mar. 22, 1950.]

THE PEOPLE, Respondent, v. WILLIAM A. RICH, Appellant.

Alfred J. Hennessy for Appellant.

Fred N. Howser, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Elton C. Lawless, Assistant District Attorney, for Respondent.

SCHOTTKY, J. pro tem.*—Appellant William A. Rich and John Doe were charged by indictment with a violation of section 211 of the Penal Code (robbery) alleged to have been committed on January 6, 1949, in the city and county of San Francisco. Rich further was charged with four prior felony convictions. Upon being arraigned he admitted the prior felony convictions but pleaded not guilty to the offense charged. After a trial by jury he was found guilty and sentenced to the state prison. This appeal is from the judgment of conviction and from the order denying a new trial.

On the morning of January 6, 1949, shortly after 8 o'clock, two men entered the Department of Employment Office of the State of California, then located at 1690 Mission Street, San Francisco. Mrs. Kathleen Regan, a cashier, was just about to start down the stairs from the mezzanine to her job on the first floor, previously having gone to the cashier's cage on the mezzanine "to say hello to one of the girls," when she was stopped by the two men. She was ordered by the taller of the two—identified on the trial as Daniel J. Mammini—to go back. The smaller one, whom the People claimed was the defendant Rich, "pulled a gun," and she turned around and went back toward the cashier's cage. Mammini told her to open the door and she replied that she could not because it was locked. Mammini then put a red bandana over his face, threw a brown paper shopping bag over the top and into the approximately 7-foot-high cage, and ordered those inside to put all their money into it; he then pulled a revolver from his waistband and "told them to hurry up, that he would give them three minutes to get the money in the bag." Mrs. Lucille Spear, head cashier for the Department of Employment Office

---

*Assigned by Chairman of Judicial Council.

and one of the four people in the cage at the time of the holdup, brought the paper bag filled with the money to the door and handed it to Mammini. Mrs. Regan had been standing outside the cage all this time and had had an opportunity to observe the smaller man in a well-lighted position. She then was told to enter the cage by Mammini, which she did. After telling them not to scream, the two men disappeared.

On the day before, January 5, Mrs. Spear, as head cashier for the Department of Employment Office, had drawn on the Bank of America three checks payable to Brink's Armored Car Service, specifying the time of delivery and the denominations of the currency desired. Two sealed canvas sacks, one containing $10,000 and the other $20,000, were delivered by a messenger for Brink's, who arrived at the mezzanine of the employment office at 8 a. m. on January 6 and left about 8:05 a. m. The money from the $20,000 sack was being distributed by Mrs. Spear to the various cashiers in the cage when Mammini appeared at one of the wire-screened windows or openings and ordered that it be collected and put into the paper bag, including the unopened $10,000 sack which was lying on a chair. This Mrs. Spear did. Mrs. Spear testified that approximately $26,827 was taken, as verified by state auditors immediately after the theft. Nine thousand, six hundred and twenty-two dollars had been left from the preceding day, and $13,000 was not put into the bag.

The two sacks of money which were delivered that morning by Brink's had been obtained by them the day before from the Bank of America. Each package of currency contained 100 bills and had a band of the Federal Reserve Bank around it. The money had been counted and checked at the Federal Reserve Bank in San Francisco and a stamp put on the band around each package showing the initials of the person who had checked it.

On February 5, 1949, just after he alighted from a plane at Boeing Airport in Seattle, appellant William Rich, traveling under the name of William Morgan, was taken into custody. He was taken to his hotel room where he was searched by the officers and on his person were found about $1,600 in currency and an ounce of narcotics; and in a suitcase in the room there were found $2,000 in currency together with a Federal Reserve Bank money wrapper bearing the initials "A. C. L."

■ Appellant first contends that the verdict is against law and then proceeds to argue that the evidence is insufficient.

He states that Mammini pleaded guilty to the crime and testified that Rich was not the man who was with him on the robbery. He argues that the testimony of the witness Police Lieutenant Martin M. Lee to the effect that Mammini had told him Rich was in on the robbery with him was hearsay and inadmissible, and that its admission was prejudicial error. He particularly attacks the testimony of Kathleen Regan as "too indefinite and uncertain to constitute a positive identification of Rich." He also asserts that the money found in his possession at the time of his arrest was not identified as the money that was taken in the robbery. He attacks various other parts of the testimony and concludes by asserting that the evidence is insufficient to support the verdict.

We shall briefly summarize the evidence as shown by the record.

There is no dispute as to the details of the robbery as hereinbefore set forth. After the arrest of appellant, Kathleen Regan went to Seattle and identified him in an eight-man lineup and at the trial she testified that she was positive Rich was the smaller man who held the gun on her during the robbery. She admitted that she previously had been shown a picture of appellant and also that before she looked at the lineup in Seattle she had been told that his leg was in a cast, but she insisted she had looked at his face and not at his feet. Appellant's counsel cross-examined her at length but she insisted that at the time of the holdup she was looking straight at the man, who stood only 5 or 6 feet away from her for 4 or 5 minutes in a well-lighted room, and that he was the defendant Rich.

Lucille Spear testified that the approximately $26,827 taken that morning consisted of currency of the following denominations: the bag containing the $10,000 had in it $5,000 in $20 bills; $2,000 in $10 bills; $2,000 in $5 bills, and $1,000 in $1 bills: in the $20,000 bag, which had been opened, there had been $14,000 in $20 bills; $3,000 in $10 bills; $2,000 in $5 bills, and $1,000 in $1 bills—some of which was not taken because it was pushed into a drawer by one of the girls. The currency was in packages of 100 bills each, a paper wrapper being around each package with a stamp on it indicating the initials of the person who had checked it.

John K. Boggs, an automobile salesman employed by Dick Dubois, Incorporated, at Seattle, Washington, testified that late in the afternoon of January 10, 1949, he had a conver-

sation with the appellant, who inquired about a new Hudson automobile. Rich left a deposit of $40 on a new car. He had selected a Hudson four-door sedan, the price of which was approximately $2,900. On the next day, January 11, Rich called again at the automobile agency, around 11 o'clock, when he paid the balance of the amount, $2,870, which he paid in cash. About 80 per cent was in $20 bills and the balance in $10 bills. Rich told Boggs he was not doing anything at present; Boggs received the impression that he had sold a cigar store in California.

Robert W. Waitt, an officer with the Seattle Police Department, testified he arrested appellant at the Boeing Airport about 12:35 on February 5, 1949. He had gone there with a fellow officer, Detective Duarri. They took appellant to his room at the Vance Hotel in Seattle. Appellant was traveling under the name of William Morgan, though he was registered at the hotel under the name of William Rich. The officers searched appellant in his room and found $1,600 on him. Two thousand dollars more in $20 bills were found in a large envelope in his suitcase under the bed. Appellant put his hand in the envelope and two officers standing close to him "grabbed his hand" and pulled the money out. There was a money wrapper in the envelope bearing the name "Federal Reserve Bank of San Francisco." The officers also found an ounce of heroin, and a sample of heroin on his person. The money was introduced in the evidence as "People's Exhibit No. 11 in Evidence."

Raymond Doherty, an inspector of police in San Francisco, testified that appellant Rich told him in Seattle, in explaining his possession of the $2,000, that after he left Folsom prison on parole he made a tour of the eastern cities "knocking over boxes [safes]" from which he got a collection of jewelry; and that he sold the jewelry in January, 1949, to a "fence" in San Francisco for $2,500, $2,000 of which he had in his suitcase when arrested.

The appellant Rich took the stand in his own defense and denied that he had taken any part in the robbery. He testified he was in Folsom prison August 6, 1948, when he was paroled to Los Angeles; that he first came to San Francisco, where he had some money put away and some narcotics; that he had $4,000; that he gave "Tony" Skinner, a married woman, $500 and went to Los Angeles that night and reported to the parole officer the following day. He testified that he later returned to San Francisco and on January 26, 1949, went to

Stockton with "Tony" Skinner; that he had a narcotics deal there and "got $2,500 on the deal," $2,000 of which had a paper band around it, and the name of the Federal Reserve Bank of San Francisco was on the wrapper. He claimed to be engaged in dealing in narcotics in San Francisco and Seattle, and in jewelry in the black market. He testified that when arrested February 5, 1949, at Seattle he had "close to $2,000" in his pocket and $2,000 in his suitcase. He was searched at his hotel and an ounce of narcotics was found on him, for which he had paid $800. He stated he could "cut that with . . . sugar of milk" and "make five ounces out of it," which would retail for approximately $10,000 or $11,000. He admitted that he had been convicted of four prior felonies. He admitted buying an automobile in Seattle and paying for it in $10 and $20 bills, and claimed that he got the money for the purchase of the car "from the deals in narcotics."

Dan J. Mammini, called by the defense, testified his then address was San Quentin; that he was arrested for robbery of the Department of Employment Office and pleaded guilty. He recounted the details of the holdup of the employment office with the aid of another person, substantially as stated by Mrs. Regan. On cross-examination, he admitted he had a prior conviction of second degree burglary. He denied that Rich was the other man who assisted him in the employment office robbery. He denied telling the assistant district attorney when questioned at the county jail that if he would testify against Rich his life "wouldn't be worth a plugged nickel in San Quentin." He denied telling Police Lieutenant Lee that he "made a mistake in getting Rich in on the job." He admitted he had read that Rich was arrested for the holdup. He denied telling Lieutenant Lee that "[his] heart fell" after he learned of Rich's arrest. He claimed he did not tell Lee that Rich was arrested in a narcotics deal, that "all narcotics [users] would turn stool pigeon" and that he was "afraid." He denied admitting to Lieutenant Lee that Rich was the other man in the holdup.

Police Lieutenant Lee, called in rebuttal by the People, testified that he brought Mammini back to San Francisco from Los Angeles, and that he had questioned Mammini at the office of the robbery detail of the Los Angeles Police Department on March 29, 1949. He testified, without objection, that Mammini told him he intended to plead guilty to the robbery charge, and that he said "You have the right man. Rich was with me but I want it understood now . . . I am not going

to testify against him." Then Lee was permitted to relate, without objection, the full details of the robbery as told to him by Mammini, wherepon counsel for appellant for the first time objected, stating: "I object to all this testimony and move to strike it out on the ground it is hearsay testimony and incompetent as regards Rich." The motion was denied by the court and the following then appears in the record:

"Mr. Lawless [assistant district attorney and counsel for the People]: Q. Now, on the way back from Los Angeles in the automobile of Mammini, did you have any conversation with Mammini in regard to Rich? Mr. Hennessy [counsel for defendant and appellant]: I object to that on the ground it is an extraditious statement outside of the presence of the defendant. It is hearsay and incompetent. The Court: Objection overruled. You may answer. The Witness: A. Yes, sir. We conversed considerably with Mammini and several times the subject of Rich was brought up. Mr. Lawless: Q. What was said? A. Sometime I asked him, I said, 'Dan, did you think you were going to get away with this job? When did you first get the idea that you may be caught? And he said, 'One morning in February I was down at the corner and bought a newspaper,' he said, 'I opened it up and I saw where Rich ——' Mr. Hennessy: If the Court please, my objection goes to all the testimony. The Court: Very well. The Witness: A. '— had been arrested in Seattle with narcotics.' He said, 'My heart fell down to my shoes, because the narcotics was something new to me,' He said, 'I thought Rich would stand up but when I saw he was arrested with the narcotics and everybody knows that a hophead talks, I knew I was sunk.' Mr. Lawless: Q. Was there any—did he make any statement when he met the Defendant Rich? A. Yes, I asked him in Los Angeles and he said they had first met about one month prior to the robbery. Q. Where? A. In San Francisco. Q. They had met in San Francisco? A. Yes, sir."

Mrs. Antoinette Skinner then was called as a witness by appellant. She testified that she was a housewife; that she had known appellant since about 1945; that the last of August or the first part of September, 1948, she had met him on Taylor Street in San Francisco and they had gone out to dinner, and he had given her $500; that she met him again in January, 1949, and they had driven to Stockton that afternoon; that while she sat in his parked car he went into a restaurant and when he came out he handed her "more than $2,000" in

currency with a flat brown wrapper on it and marked "$2,000" on the seal, and that she kept it in her purse for him until they returned to San Francisco the same night.

So far as the appellant's argument that the evidence is insufficient is concerned, it has little merit, and is in effect an argument as to the weight of the evidence and the credibility of witnesses, which are matters more properly argued to the trial court and jury. There can be no question as to the sufficiency of the evidence to sustain the conviction of appellant. In fact, it may be stated that a careful reading of the record convinces us that it would have been difficult for the jury to have arrived at any other conclusion.

The identification of appellant by Kathleen Regan was clear and positive and the witness had had abundant opportunity to observe him at the time of the holdup. The currency found in appellant's possession when he was arrested was of similar denominations as that stolen and the brown wrapper around the $2,000 package was from the Federal Reserve Bank in San Francisco and had the initials "A. C. L." stamped on it. Within three or four days after the robbery appellant purchased an automobile in Seattle, paying the purchase price of $2,900 in currency, 80 per cent of which was in $20 bills and the rest in $10 bills. The $30,000 delivered at the Department of Employment Office on the morning of the robbery contained $19,000 in $20 bills and $5,000 in $10 bills. The appellant had been paroled from Folsom prison on August 6, 1948, just four months before the robbery. Appellant's explanation that the money found in his possession and the money paid for the automobile were derived from his dealings in narcotics might well have taxed the credulity of the jury, and likewise the explanation that Inspector Doherty testified appellant made, when arrested in Seattle, to the effect that he got the money found in his possession from the sale of jewelry derived from a series of robberies in the East following his parole. Mammini's testimony that appellant was not implicated in the robbery was impeached by Lieutenant Lee's testimony of contrary statements made to him. Furthermore, both appellant and Mammini were impeached by evidence of a number of prior convictions of felonies.

The strongest point made by appellant is his contention that prejudicial error was committed in permitting the People's witness, Lieutenant Lee, to testify as to statements made by Mammini, outside of the presence of appellant, implicating appellant in the robbery. He argues that such evidence

was hearsay and should have been excluded. It does not require the citation of authority to support the proposition that such evidence was hearsay and that, ordinarily, it would be inadmissible. But here, Mammini, when he was on the stand, was asked whether or not he had not made such statements to Lieutenant Lee, and the People were entitled to impeach his testimony by proving he had made such statements. It may be that the questions were not asked of Lieutenant Lee in the usual form of impeaching questions, but no objection was made on that ground. If appellant had made an objection as to the form of the questions, the court no doubt would have ordered that the questions be put in the usual form; but appellant not having made such objections and the answers to the questions being to the effect that Mammini had made the statements to Lieutenant Lee that he denied making in his testimony, we cannot hold that the court erred in overruling appellant's objections that the testimony was hearsay or in denying appellant's motions to strike it out. Furthermore, the trial court instructed the jury on the subject of impeachment of a witness, pointing out that such evidence is not received for the purpose of proving the truth of what then was said, but only for the purpose of testing the credibility of the witness.

 Appellant also charges there was prejudicial misconduct on the part of the assistant district attorney during the course of the trial. During the prosecution's final argument, counsel for appellant constantly interrupted the assistant district attorney, and the assistant district attorney used language toward him that should not be used in a courtroom, whereupon counsel for appellant retaliated by hitting the assistant district attorney on the chin. It is unfortunate that the trial court allowed counsel on both sides too much latitude, as both failed to maintain the decorum appropriate to a judicial proceeding. However, counsel for appellant was more culpable than the assistant district attorney and we are unable to see how the appellant was prejudiced.

 Appellant in a supplemental brief contends that the court erred in giving the following instruction on flight: ''The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, *if proved*, may be considered by you in the light of all other proved facts deciding the question of his guilt or innocence.

Whether or not evidence of flight shows a consciousness of guilt, and the significance to be attached to such a circumstance, are matters for your determination.'' (Emphasis added.)

There was no error in giving this instruction. The court qualified the jury's consideration of the significance of any flight by adding the words ''if proved.'' The evidence showed that the defendant had registered at a hotel in Seattle on January 8, two days after the robbery, and on January 10 and 11 had negotiated in Seattle for the purchase of a new car. The fact that he subsequently returned to San Francisco and except for short trips remained in San Francisco about a month would not necessarily destroy the impression of original flight. Flight was not presumed by the court. The determination of that fact was left to the jury.

Appellant in his supplemental brief asserts that the court was repeatedly in error in ruling on questions of law and sets forth, by page and line, 35 instances of such rulings. Appellant does not point out what such rulings were or wherein the court erred. Notwithstanding the undue burden placed upon this court by such a shotgun method of appeal, we have examined the record as to such assignments of error, and are convinced that no prejudicial error was committed in any of such rulings.

The judgment and order are affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied April 20, 1950.